**LIBBY, McNEILL & LIBBY, Appellant,**

v.

**James P. MITCHELL, Secretary of Labor, United States Department of Labor, Appellee.**

**No. 16865.**

United States Court of Appeals
Fifth Circuit.

June 26, 1958.

Rehearing Denied Aug. 11, 1958.

L. Robert Frank, Tampa, Fla., Willard Ayres, Greene, Ayres & Green, Ocala, Fla., Allen, Dell, Frank & Trinkle, Tampa, Fla., for appellant.

Sylvia S. Ellison, Bessie Margolin, Attys., Dept. of Labor, Washington, D. C., Stuart Rothman, Solicitor, Eugene R. Jackson, Atty., Dept. of Labor, Washington, D. C., Beverley R. Worrell, Regional Atty., Birmingham, Ala., for appellee.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether the production of citrus pulp cattle feed and citrus molasses simultaneously performed during the processing of fresh citrus fruits into canned or concentrated frozen juices or fruit entitled the Employer to an Fair Fair Labor Standards Act § 7(b) (3) "seasonal industry" exemption. It is conceded that for these two by-product operations the Employer is entitled to the § 7(c) exemption.

■ At the outset it simplifies our understanding to contrast in a gross way these two exemptions [1] §§ 7(b) (3) and

---

[1]. 29 U.S.C.A. § 207.

"7(b): No employer shall be deemed to have violated subsection (a) of this section by employing any employee for a workweek in excess of that specified in such subsection without paying the compensation for overtime employment prescribed therein if such employee is so employed—

    *      *      *      *      *

"(3) for a period or periods of not more than fourteen workweeks in the aggregate in any calendar year in an industry found by the Administrator to be of a seasonal nature, and if such employee receives compensation for employment in excess of twelve hours in any workday, or for employment in excess of fifty-six hours in any workweek, as the case may be, at a rate not less than one and one-half times the regular rate at which he is employed.

7(c). Section 7(c), if applicable, is so because of its own terms. It is self-executing and requires only that the facts bring the employer's activity under it. Section 7(b)(3), on the other hand, is not self-executing. It applies only to "an industry [2] found by the Administrator to be of a seasonal nature." A finding by the Administrator is therefore an indispensable requirement. Under § 7(c) the fourteen week exemption relates to overtime for all hours worked in excess of 40 hours. Under § 7(b)(3) the exemption is limited to a maximum of 12 hours in any one day and 56 hours in any one workweek. And, of extreme importance, under § 7(c) the exemption applies only to those *employees* "engaged in the first processing of * * * seasonal fresh fruits or vegetables * * *" whereas § 7(b)(3), on the other hand, extends the exemption to "any employee * * * if such employee is * * * employed * * * in an industry." It is at this point that the issue is crucial here for while those employees engaged directly and immediately in the manufacturing process of citrus pulp feed and citrus molasses come under § 7(c), a large number of clerical, administrative and service employees who would be "employed * * * in an industry" under § 7(b)(3) are not within the reach of § 7(c). In addition, although not stressed here, we understand that the two exemptions may under some circumstances be cumulative.

■ Both exemptions are therefore valuable and if applicable are as important in the Congressional pattern as any other provision. For the Wage and Hour Act is a complex piece of legislation in which Congress, articulately seeking to accommodate the general aims of this legislation to our diverse economy, was as acutely concerned over the areas and circumstances not covered as those covered. See Maneja v. Waialua Agricultural Co., 349 U.S. 254, 75 S.Ct. 719, 99 L.Ed. 1040.

The problem becomes somewhat unmanageable and awkward if the two exemptions are not carefully distinguished. This is especially so where such terms as "first processing" are used in the definitive description of an industry found by the Administrator to be seasonal under § 7(b)(3) and which are, of course, the statutory basis under § 7(c). Indeed, this is the heart of the Employer's approach. For in the final analysis it treats the "first processing" of § 7(c) and the "first processing" in the Administrator's 1940 determination of the seasonal nature of the fresh fruit industry as a common denominator. The Employer, transposing this in the equation, then contends that whatever comes within "first processing" under § 7(c) automatically is eligible under § 7(b)(3) if the Administrator's determination of a given seasonal industry expressly encompasses a "first processing" operation. In this approach the Employer has respectable analogous support in the so-called Musselman doctrine, now formally recognized by an Administrator's Regulation [3] under which by-product operations carried on simultaneously with and as an integral

---

"7(c): * * * in the case of an employer engaged in the first processing of, or in canning or packing, perishable or seasonable fresh fruits or vegetables * * *, the provisions of subsection (a) of this section, during a period or periods of not more than fourteen workweeks in the aggregate in any calendar year, shall not apply to his employees in any place of employment where he is so engaged."

2. The Act defines "industry" to mean a "trade, business, industry, or branch thereof, or group of industries, in which individuals are gainfully employed." 29 U.S.C.A. § 203(h).

3. "29 CFR § 780.51 *First Processing under section 7(c)*. (a) Introductory Statement. In the light of administrative experience and of certain relevant court decisions, the Secretary of Labor and the Administrator of the Wage and Hour and Public Contracts Divisions hereby set forth in this section a modification and clarification of certain interpretations published in Interpretative Bulletin No. 14, in Release R–1892, or in any other statements relating to the 'first processing' exemptions provided in section 7(c) of the Fair Labor Standards Act.
"(b) Perishable Commodities.—(1) Processing performed in a single place

part of first processing of fresh fruits or vegetables are deemed to be § 7(c) "first processing" up to the point in the manufacturing process of the first non-perishable by-product.

With "first processing" as the common denominator and the Musselman concept as its theme, the Employer makes a substantial factual showing. For it is without dispute that, almost as with any modern manufacturing undertaking, the impact of irrepressible, competitive drives and forces has brought about in the Florida citrus industry during the postwar decade, a remarkable industrial process in which by efficient stream and assembly line techniques the fresh whole citrus fruit is simultaneously processed [4]

to the point of practical exhaustion of all edible as well as inedible products and by-products.

Were this approach correct, we would certainly agree with the Employer and disagree with the Court below.

But this approach, in our view disregards, first, the necessity for a *finding* by the Administrator that production of citrus pulp feed or citrus molasses (or both) is a seasonal industry, and second, the fact that, as to part in 1952, and as to all of it in 1955, the Administrator has found that such operation is not a seasonal industry.

It is true, of course, that in 1940 the Administrator dealt with two phases of the fresh fruit and vegetable business

---

of employment. An employer who commences processing operations on a perishable commodity to which the exemption in section 7(c) for first processing applies, is considered engaged in the first processing of the named commodity throughout each series of operations, including by-product operations, which commence with such initial processing of the named commodity and are performed in the same place of employment as a continuous series of operations during which the commodities remain perishable.[1]"

The footnote [1] cited the following Musselman cases: "McComb v. C. H. Musselman Co., [D.C.] 74 F.Supp. 185, affirmed [3 Cir.,] 167 F.2d 918; Sugar Creek Creamery Co. v. Walker [208 Ark. 639], 187 S.W.2d 178; Shain v. Armour & Co., D.C.W.D.Ky., 50 F.Supp. 907; Walling v. Bridgeman-Russell Co., 2 W.H. Cases 785, (D.Minn.)." To these may be added these similar cases: McComb v. Hunt Foods, Inc., 9 Cir., 167 F.2d 905, certiorari denied 335 U.S. 845, 69 S.Ct. 69, 93 L.Ed. 395, affirming Walling v. California Conserving Co., D.C., 74 F.Supp. 182; Hendricks v. Di Giorgio Fruit Corp., D.C.Cal., 49 F.Supp. 573.

4. This process is aptly described in the Employer's brief:

"In the processing operation the fresh fruit after it has been graded and washed is placed in a fruit extractor where the juice is separated from the peel, seed and pulp. From the extractor the juice is piped into a surge tank and then to evaporators where it is concentrated. After it is concentrated it is blended in blending tanks and from there placed in a

can and frozen after which the cans are cased and ready for market. The citrus peel, seeds and pulp is conveyed from the fruit extractors to a peel surge bin and from there it goes into a peel shredder where it is shredded and cut. Next, the shredded pulp is conveyed to a mixer where it is thoroughly mixed and then conveyed into a peel press, where the press water is separated from the pulp, seed and other solid parts. The solid material after separation is conveyed to a peel drier or dehydrator. The press water after being conveyed to a surge tank is pumped into an evaporator where the moisture is evaporated from the water resulting in a syrup like fluid called molasses. This molasses is added back to the pulp coming from the peel press and on its way to the drier or dehydrator. The combined dried pulp and molasses is allowed to remain in the drier until thoroughly dried after which it is cooled and bagged. The entire process, that is, from the fresh orange to the finished product takes approximately two hours.

"The pulp operations are an integral part of the concentrate operations and said operations are interdependent. Both operations are carried on at the same location and at the same plant. The machinery used in the processing of each is so interrelated and connected that a break-down at any point would shut down both operations. As is the case of the juice leaving the extractor, the pulp and other waste material are highly perishable and must be processed within six hours."

and as to them it found two things. First, that "3. The packing, handling, and preparing in their raw or natural state of perishable or seasonal fresh fruits and vegetables is a branch of an industry and of a seasonal nature within the meaning of Section 7(b)(3) of the Fair Labor Standards Act and Part 526, as amended, of the Regulations [5] issued thereunder." Having found the first, the question then followed whether first processing and canning of such perishable fruit was a branch of an industry of a seasonal nature. The second finding then was that "5. The first processing and canning of perishable or seasonal fresh fruits and vegetables is a branch of an industry and of a seasonal nature within the meaning of Section 7(b)(3) of the Fair Labor Standards Act and Part 526, as amended, of the Regulations issued thereunder."[6]

But while Courts were some day to hold, and the Administrator finally recognized, see note 3, supra, that *by-product operations* carried on simultaneously to the point of the first non-perishable product were to have the § 7(c) "first processing" status, this was not the course followed as to citrus pulp. Almost immediately it was, as a practical matter,

treated as something other than "first processing." At least it was in the sense of the 1940 finding that first processing of fresh fruit was a branch of an industry and of a seasonal nature within § 7 (b)(3). Instead of relying on such an interpretive application of "first processing", interested segments of the industry in 1941 sought a determination that, as carried on in Florida, Texas and California, the citrus pulp operation was seasonal in nature. This was rejected by a finding that the industry was not seasonal in nature since it appeared that citrus waste was available for approximately eight months in Florida. In 1943 reconsideration of this adverse 1941 determination was sought by Florida processors of citrus waste. This rehearing resulted in a finding [7] of seasonality for the Florida and Texas branches of the industry. The basis was stated to be that while the evidence showed that "citrus waste [was] technically available in Florida for a period of approximately eight months," various factors made it actually "available * * * for a period of time averaging six to seven months out of each year."

■ There was thus administrative determination as to citrus pulp by-prod-

---

5. In testing seasonality, the Administrator has used the "substantial six months" standard prescribed in § 526.3 of the Regulations 29 CFR 526 which, as last amended, provides:

"§ 526.3 *Industry to which the exemption is applicable.* The exemption for an industry of a seasonal nature is applicable to:

"(a) An industry which:

"(1) Engages in the handling, extracting, or processing of materials during a season or seasons occurring in a regularly, annually recurring part or parts of the year not substantially greater than six months; and

"(2) Ceases production, apart from work such as maintenance, repair, clerical, and sales work, in the remainder of the year because of the fact that, owing to climate or other natural conditions, the materials handled, extracted, or processed, in the form in which such materials are handled, extracted, or processed, are not available in the remainder of the year * * *."

6. Preliminary to this finding, the Administrator had found:

"4. Perishable or seasonal fresh fruits and vegetables are subjected to first processing or are canned in establishments which typically operate during an annually recurring season or seasons of six weeks to six months and cease first processing or canning operations during the remainder of the year, except for such work as repair, maintenance, sales, or clerical work, because the fruits and vegetables are no longer available due to climatic or other natural factors."

7. The Administrator found:

"4. The dehydration of citrus pulp and waste and the manufacture of cattle feed therefrom, insofar as the dehydration of citrus pulp and waste in the states of Florida and Texas are concerned, is an industry of a seasonal nature within the meaning of Section 7(b) (3) of the Act and part 526 of the Regulations issued thereunder."

uct operations that (a) such activities were not automatically under the "first processing" 7(b) (3) determination of 1940 and (b) would require a specific separate application and determination, and (c) were seasonal in nature because citrus waste was actually available substantially for only six months. As this continued to be the determination until 1952 when the citrus molasses application for 7(b)(3) seasonal finding was denied, it comes here with the unique imprimatur which the Fair Labor Standards Amendments of 1949, § 16(c), 63 Stat. 910, put on pre-1949 orders, regulations, and interpretations of the Administrator. Alstate Construction Co. v. Durkin, 345 U.S. 13, 16–17, 73 S.Ct. 565, 97 L.Ed. 745; Maneja v. Waialua Agricultural Co., 349 U.S. 254, 270, 75 S.Ct. 719, 99 L.Ed. 1040; Steiner v. Mitchell, 350 U.S. 247, 255, 76 S.Ct. 330, 100 L.Ed. 267.

This state of fact was again recognized in 1952 when application was made by the Citrus Processors Association, Inc. to extend to citrus molasses the 1943 determination, note 7, supra, which was limited to the manufacture of citrus pulp cattle feed. Citrus molasses, as the description of the process, note 4, supra, reveals, is a by-product which is capable of separate use as such, or, as here, in reconstituting the dried pulp into feed.

Not only does this demonstrate again the uniform administrative treatment of the citrus pulp by-products operation as one separate and apart from the 7(b)(3) "first processing" status earlier accorded in 1940, but it reflects the substantial basis for it. In 1943 the Administrator reversed his 1941 ruling on the ground that citrus waste, while theoretically available, was not *actually* available in excess of six months. But by 1952 post-

war developments had occurred which were almost revolutionary in nature. Production of fruit of different varieties resulted in a marked and spectacular growth[8] in the volume and extent of operations. The citrus fruit operations and those related to it had expanded to the point where it was carried on for nearly the whole of the year. In this setting, on facts which the Employer does not here challenge, the Administrator denied the 1952 application. In doing so, the Administrator found that "citrus canning and concentrate plants now operate for 10 to 11 months and in heavy volume for at least 8 months; hence citrus pulp and waste from these plants are 'technically' available for a period of 10 to 11 months in the State of Florida and are actually available in large quantities for processing into cattle feed and molasses for at least 8 months during the year. * * * This pattern of operations represents a marked contrast with the situation when the previous determination was issued [1943], at which time the pattern of the dehydration industry was found to be a 6 to 7 months period including a trial period at the beginning of the season."

Three years later the Administrator, in 1955, again reviewed the whole citrus fruit industry on the application of labor unions which sought, not only revocation of the 1943 citrus pulp cattle feed 7(b) (3) determination, but made a broad attack on the 1940 finding of seasonality as to the Florida citrus fruit and first processing operations on the ground that even these direct activities were no longer seasonal in fact. On the 1955 record which formally included the 1952 citrus molasses record and other data, it was found, and later confirmed by the Administrator, that the 1943 finding of seasonality, note 7, supra, for the citrus pulp

---

8. This growth was summarized in the Hearing Officer's report of the 1955 determination:

"There has been a tremendous increase in the quantity of citrus grown and the quantity processed since the fresh fruit and vegetable determination was issued. More than twice as much fruit is now grown, with virtually the entire increase going into processing rather than fresh markets. The amount processed has increased from 17,825,000 boxes in 1939–40 to 83,719,000 boxes in 1953–54. Most of this increase has gone into the production of frozen concentrated juices."

and waste industry as applied to the Florida branch of the industry should be revoked. As the § 7(b)(3) exemption relates to an "industry," not an individual employer, the hearing properly encompassed the probable duration of these processing activities throughout the state. It was found that the "length of the season [had] increased substantially since the original pulp determination was issued" and "the length of the pulp dehydration season typically is longer than that for any single fresh fruit operation, since the dehydration operation utilizes the pulp and waste from all fresh fruit operations." As the subject of inquiry was the citrus waste pulp industry (and not the operational period of time of any individual plant engaged in it), the finding was significant that "Those plants that receive raw material from more than one canning or concentrating plant will start operations when a sufficient quantity is received from the first plant and continue until the last plant ceases operations."

Again proffering these findings and the Administrative report in evidence, the Employer here does not challenge the facts found. The Employer's contention is that if the citrus pulp by-product operation now extends substantially for 8 months or more (as it thus concedes), the same is true of the 1940 determination concerning the "packing, handling, and preparing in their raw or natural state" and "the first processing and canning" of the fruit itself.[9]

9. Because even these direct activities regularly occurred throughout substantially the whole year and way beyond the six-months standard, the Hearing Officer found that those operations could not, standing alone, qualify as seasonal in nature. Largely on the ground that Florida citrus fruits competed nationwide with other fresh fruits and vegetables, he concluded, although the question was a "close" one, that this part of the Florida citrus activities should not be treated as a separate industry. Accordingly, so much of the application as sought the revocation of the 1940 determination was denied and subsequently confirmed.

10. See definition of "industry", note 2, supra.

■ Such an argument will scarcely pass muster. For merely because another obtained more than was warranted is no reason to afford similar relief to one who, on recognized and valid standards, has not demonstrated an eligibility. Additionally, it assumes here that because the Florida orange or grapefruit and their canned or concentrated edible products compete nationwide with other fresh fruits and vegetables sufficiently to justify a nationwide definition of that industry, this inescapably requires that all manufacturing operations industrially related to this fresh fruit are a part of *that* industry.[10]

Neither this record nor the long-settled administrative practice supports any such assumption. Cattle feed, citrus molasses, or citrus molasses mixed in pulp cattle feed are hardly a part of that intricate system by which in countless markets and groceries, at crossroads, in villages or metropolitan areas, America's millions may procure their daily ration of the highly advertised vitamins and nutrition from nature's bounty. And, at the same time, this practical difference in the nature of the goods, and the consistent administrative practice both recognizing and establishing it, also supports the reasonableness of the 1952 Amendment to the initial 1940 determination that "first processing" of fresh fruits was a 7(b)(3) seasonal industry. This Amendment[11] expressly excludes by-product operations as a part of the fresh fruit "industry."

11. After reciting that in the initial finding of August 24, 1940, it was the position of the Administrator that the term "first processing" did not include by-product operations either for 7(b)(3) or 7(c), and the fact that subsequently on August 30, 1952, the amended Regulation set forth in note 3, supra, was issued as to 7(c), the Administrator, to " * * * make [the] intention clear on the face of the determination" that this subsequent action was not intended to extend the original 1940 finding, made the formal order amending the 1940 determination (see text at note 6, supra) by the addition of the italicized portions:

"5. The first processing and canning of perishable or seasonal fresh fruits

There was thus ample basis for the finding that citrus pulp cattle feed and citrus molasses, alone or together, were operations not seasonable in nature, and that such operations constituted an "industry" separate and apart from the fresh citrus fruit "industry." The determination came only after there had " * * * been a fair hearing, with notice and opportunity to present the circumstances and arguments to the decisive body, and an application of the statute in a just and reasoned manner." Gray v. Powell, 314 U.S. 402, 411, 62 S.Ct. 326, 332, 86 L.Ed. 301, 309. The result was not arbitrary. It had ample factual support. And since "The Administrator fulfills his role when he makes a reasoned definition," Mitchell v. Budd, 350 U.S. 473, 480, 76 S.Ct. 527, 531, 100 L.Ed. 565, 574, it was and is valid. Within the framework of the statutory definition of "industry," the determination whether in a given situation, it comprises a single branch of an industry, several branches of an industry, a whole industry, or a group of industries, is one committed to the reasoned and informed discretion of the Administrator. Opp Cotton Mills v. Administrator, 312 U.S. 126, 149–150, 657, 61 S.Ct. 524, 85 L.Ed. 624, 638; Columbus & G. Ry. Co. v. Administrator, 5 Cir., 126 F.2d 136, 139; Pearson v. Walling, 8 Cir., 138 F.2d 655, 657, certiorari denied 321 U.S. 775, 64 S.Ct. 616, 88 L.Ed. 1069.

We disagree, however, that the effective date was 1952 so that, as asserted in the Administrator's complaint for injunction, this Employer was in violation "during the period since February 27, 1953" with respect to its operations, described in note 4, supra, in the production of its citrus pulp cattle feed with molasses. While the handwriting on the wall was then so plain that it required no Daniel as a seer, the fact is that as to citrus pulp cattle feed, the 1943 express determination of 7(b)(3) seasonal industry, note 7, supra, remained in effect until February 17, 1956, when the 1955 revocation of the 1943 determination became effective.[12]

The citrus pulp cattle feed "industry" thereby defined, was entitled to rely completely on the 1943 finding until it was revoked. Here this Employer's production of citrus molasses is but a momentary manufacturing result in the continuous integrated production of a cattle feed fortified by citrus molasses. So far it appears it was producing citrus cattle feed only. Until the effective date of the 1955 determination, note 12, supra, that was declared to be a seasonal industry and 7(b)(3) applied to it. To this extent, the findings and decree of the Dis-

---

and vegetables is a branch of an industry and of a seasonal nature within the meaning of Section 7(b)(3) of the Fair Labor Standards Act and Part 526 as amended of the Regulations issued thereunder. *As used in this determination, the first processing of perishable or seasonal fresh fruits or vegetables includes the initial operation which changes the form of the whole fresh fruit or vegetable and all operations on its main portions when performed in a single process as a continuous series of operations throughout which the commodity remains perishable, but does not include by-product operations.*"

12. On the petition of review of the Hearing Officer's 1955 determination, the Administrator on January 12, 1956, ordered: " * * * the petitions are hereby denied. The findings and determination of the presiding officer that: * * *

"(3) The dehydration of citrus pulp and waste in Florida may

"(a) be considered separately from Texas operations at this time, and

"(b) is not an industry of a seasonal nature within the meaning of section 7(b)(3) of the Act and the regulations,

"(4) The determination of March 25, 1943, that the dehydration of citrus pulp and waste in Florida and Texas is of a seasonal nature, is revoked insofar as it applies to operations in Florida, are hereby made final and the revocation with respect to the dehydration of citrus pulp and waste will become effective 30 days after publication of this notice in the Federal Register, as provided in section 526.10 of the regulations." This was published in the Federal Register January 18, 1956.

trict Court must be reversed with directions to modify the decree. Otherwise it is affirmed.

Reversed and remanded in part with directions; otherwise affirmed.