**CONTINENTAL OIL COMPANY,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 17016.

United States Court of Appeals
Fifth Circuit.
April 17, 1959.

Roland B. Voight, Bruce R. Merrill, Houston, Tex. (Lloyd F. Thanhouser, Houston, Tex., Dow, Lohnes & Albertson, William J. Grove, Carroll L. Gilliam, Washington, D. C., on the brief), for petitioner.

Howard E. Wahrenbrock, Solicitor, Willard W. Gatchell, Gen. Counsel, Robert L. Russell, Asst. Gen. Counsel, John Cosmic, Atty., Federal Power Comm., Washington, D. C., for respondent.

Before TUTTLE, JONES and BROWN, Circuit Judges.

TUTTLE, Circuit Judge.

Continental Oil Company is a natural gas company within the meaning of the Natural Gas Act, 15 U.S.C.A. § 717 et seq. It sells the gas produced from a single dry gas well in Lea County, New Mexico, to El Paso Natural Gas Company. In its brief, Continental asserts: "Sale of the gas takes place in the well head. Delivery occurs at the point where the facilities owned by Continental end and the facilities owned by El Paso begin; that is, at the point where the gas enters the 4-inch by 2-inch reducing swage [owned by El Paso] where it is screwed inside the 4-inch master valve [owned by Continental]." Before it reaches this critical delivery point the stream of gas has moved up through the casing and through two master valves, either of which has the potentiality to shut off completely the flow of gas, but neither of which is designed or suitable to regulate the flow, i. e., increase or decrease it. The top member of the upper master valve is a threaded 4-inch aperture into which El Paso's reducing swage is screwed. This is the point of delivery of the gas to the purchaser, as described by petitioner above. The stream thereafter flows through a T and then through pipes, generally horizontally, to El Paso's meter and valve which controls the flow from the well.

Continental finished drilling the well and constructed part of the "Christmas tree," that is, the flanges and two master valves, and then, by closing the valves, shut off the stream of gas until after the sales contract was made with El Paso some six months later. Thereupon El Paso inserted the reducing swage and attached the T connection above it; the horizontal pipes were connected; Continental's master valves were opened and

the flow began, subject thereafter to be regulated by El Paso by the opening and closing of its valves downstream from the above described equipment.

The question here is whether the Federal Power Commission was authorized to find that any of the "facilities" of Continental were subject to its jurisdiction. The question came up by petitioner's filing an application under protest for a certificate of public convenience and necessity accompanied by a petition for a declaratory disclaimer of jurisdiction, followed by an order of the Commission issuing the certificate as to the sale of the gas and also a certificate as to "such portions of the 'Chistmas tree' that are owned by Continental and serve to contain the gas at the point of delivery," stating that such facilities "are facilities for effecting the sale of gas in interstate commerce."

In addition to requiring a certificate authorizing the sale of gas by natural gas companies, the Natural Gas Act requires in Section 7(c) a certificate authorizing the construction or extension, acquisition or operation of "any facilities" for the sale of natural gas, subject to the jurisdiction of the commission.[1]

Petitioner based its application for disclaimer on the contention that it has no facilities for sale of natural gas, but if it has they are also facilities of production, and that if any facilities for the sale of gas are also facilities used in the "production or gathering" of the gas the commission could not acquire jurisdiction over them because of the specific exemp-

tion of Section 1(b)[2] which provides that, "The provisions of this act shall * * * not apply to * * * the local distribution of natural gas or to the facilities used for such distribution *or to the production or gathering of natural gas.*" (Emphasis added.) Although not specifically so providing, the language of this exemption has, as to other types of facilities, been held to cover facilities of production or gathering. See Federal Power Commission v. Panhandle Eastern Pipe Line Company, 337 U.S. 498, 504–505, 69 S.Ct. 1251, 93 L.Ed. 1499. See also Deep South Oil Company of Texas v. Federal Power Commission, 5 Cir., 247 F.2d 882, 889.

The Commission says that there are facilities here utilized by Continental that are not facilities of production and, alternatively, that even though all facilities of Continental are used for production, nevertheless if they are also essential to effect the jurisdictional sales, such facilities are not within the exemption of Section 1(b). Neither gathering nor facilities for gathering are in issue here; only facilities for production.

We think a strong argument can be made under the alternative proposition in light of the holding by the Supreme Court in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, and the decision of this Court in Deep South Oil Company of Texas v. Federal Power Commission, supra. There it was held that the affirmative grant of jurisdiction in Section 1(b) of the Act over interstate sales was

---

1. Section 7(c) provides as follows:
   "(c) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations: * * *."

2. This section provides:
   "(b) The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of nautral gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

not whittled down by the exemption of production and gathering even though it is apparent in those cases that what was there involved was what was considered in the industry to be a part of the gathering operation. It might reasonably be contended that by parallel reasoning the affirmative grant in Section 1(a), coupled with the positive language of Section 7 (c) requiring that a certificate be required as to facilities for the sale of gas can no more be nullified by the exemption of production and gathering (which does not expressly include facilities for production and gathering)[3] than can the grant of jurisdiction over the sales themselves be nullified by the exemption of production and gathering where the sales are made before production and gathering are completed.[4]

We think, however, that we need not place our decision on this alternative ground. We think, notwithstanding the claimed effect of the expert testimony to the contrary, this record discloses that there are facilities for the sale of the gas that are not facilities of production.

It is not only not disputed by petitioner, but is affirmatively argued by it that the sale of gas is completed in the well head and delivery is made at the point where El Paso's facilities receive it from Continental. It is also undisputed that the gas at the point of sale and delivery is the identical stream of gas that rises in the casing and passes through the first of the two master valves. The lower, or first of the two valves, is designed for the purpose of shutting off the flow unless and until the gas can be utilized. The upper or second valve is mechanically unnecessary to permit this operation. It is part of a normal installation clearly called for by the standard art in the industry to give flexibility in case repairs are needed or there is a failure of the single valve. In the ordinary language of purchase and sale of a product where it is in deliverable form the stream of gas is, in a sense, "produced" at the latest after it has passed through the first master valve. Even including this valve as a facility of production may be argued to be conceptually an anomaly because, physically, production and delivery can be accomplished without any valves at all. We fully recognize that for safety of *operation*, making adequate provision for repairs, etc., the unbroken custom in the industry is to contain the gas by a complex of two valves and associated equipment. This is, of course, also required by the self interest of the producer not to let the gas waste and also by the conservation and regulatory policies of the state; but this does not change the fact that in the *ordinary sense of the terms* production of the gas has been completed at or just above the surface of the ground where it is physically deliverable but then is shut in until delivery commences. But under this contract the sale is not completed then, but is completed by delivery to El Paso at the upper threaded orifice or aperture of the second or upper valve which receives the threaded swage of El Paso. Thus, we need not consider whether the first or lower valve is a facility of production, because it is not contended by the Commission that it is also a facility for the jurisdictional sale. It may therefore be conceded that it is, for the purpose of this case, an exempt facility.

Petitioner contends that the only evidence in the record demands the finding

---

3. As has been pointed out above, in cases not touching on the precise point there in issue, the courts have held that the exemption language comprehends facilities.

4. For a discussion of the treatment of a local act, see Hartford Electric Light Co. v. F.P.C., 2 Cir., 131 F.2d 953. In the Deep South case we quoted with approval from Interstate Natural Gas Co. v. F.P.C., 5 Cir., 156 F.2d 949, 951:

"[The act] is very simply and plainly written. After stating what it shall apply to, it then states what it shall not apply to. Under familiar rules of construction, a negation in or exception to a statute will be construed so as to avoid nullifying or restricting its apparent principal purpose and the positive provisions made to carry them out."

as of a fact that the upper valve is also a facility of production.[5] We think it is fundamental that the construction of the statute cannot be made to depend on such testimony, but rather on the basic facts in the record. These facts, undisputed as they are, we think require the conclusion that, so far as germane to the inquiry here, production, as the term is used in this statute, was complete at or before the passage of the gas through the upper aperture of the upper valve. Our duty here is not to determine what is generally understood in the industry, in the resolution of other relationships, as meant by "production." It is to determine what Congress meant by the term. In making such determination we are faced primarily with the unambiguous and clear intent as construed by the Supreme Court in the Phillips case to regulate these interstate sales. Since it is in line with ordinary non-technical usage, we must give to the terms the meaning that will effectuate and not the one that would frustrate the purpose of the law.

Petitioner contends that the order of the Commission implies that if delivery were made even further upstream, say at

a point at the bottom of the well, the commission would have the power to certificate the facilities thus used to effect delivery. We say that if a producer sought to test out such a theory it might then be necessary to determine whether the commission's alternative theory discussed above is valid. Here, in any event, the producer could certainly eliminate any uncertainty which it says exists as to what is meant by the Commission's terminology "such portions of the 'Christmas Tree' that are owned by Continental and serve to contain the gas at the point of delivery" if it should see fit merely to insert a length of pipe of as much as two or three inches to serve as a connector between its upper valve and the reducing swage owned by El Paso. It is little short of fantastic to consider the possibility that the jurisdiction of the Commission over facilities for sale, in light of the importance of such jurisdiction under the right of a natural gas company to terminate its services under Section 7(b),[6] could be made to depend on whether El Paso's swage screws into the top of the upper valve or into a short length of pipe which is owned by Conti-

5. The evidence on this point consisted of testimony given on behalf of petitioner by Louis W. Miller as follows:

"Q. Mr. Miller, you state that you have been in the oil and gas business for eight or nine years. Will you state whether or not you are familiar with the meaning of the terms 'produced' and 'production' as such terms are used in the oil and gas industry? A. Yes, I am.

"Q. Will you state the source of your knowledge of the meaning of such terms? A. I have heard them used many times in the field and in the business, and I have talked with many old-timers who have been in the business for years longer than I have.

"Q. Do you know whether the meaning of these terms as used in the oil and gas industry has changed in the last twenty years? A. From my discussions with the old timers and from the way in which they use such terms, I am certain that the meaning has not changed in that period as such terms are used in the oil and gas industry.

"Q. As such terms are used in the oil and gas industry, will you state when gas

has been produced or when the production of gas is competed in an operation similar to that which you have described for the Stevens B-7 Unit No. 1 Well? A. As the terms are used in the industry, the stream certainly is not produced and the production of the stream is not completed until after the stream has passed out of the Christmas tree."

6. The importance of commission jurisdiction of facilities in connection with the right to terminate service, is seen by reference to Section 7(b) of the Act, which provides as follows:

"(b) No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission an approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment."

nental and which is screwed into the valve.

What we hold here, consistent with the decision of the Courts of Appeals for the 10th Circuit and the 3rd Circuit in Saturn Oil Gas Co. v. F. P. C., 10 Cir., 250 F.2d 61, and J. M. Huber Corp. v. F. P. C., 3 Cir., 236 F.2d 550, is that the petitioner uses facilities for sale of the gas in commerce to El Paso which are not facilities in production of the gas and that the Commission's order relating to the granting of the certificate must be Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting).

In my judgment the Court by this opinion engages in impermissible fact finding for which it has neither statutory warrant nor technical competence. It interprets the Natural Gas Act in terms of what it conceives is necessary effectually to enforce what it deems to be the policy of the law. In doing so it ignores the plain words of Congressional limitation on the basic power of the Federal Power Commission. Worse, it reads out of the Act both these words and the equally emphatic technical meaning ascribed to them not less than three times by the Supreme Court. Apparently from the demands of administrative necessity it reads the word "production" of natural gas as entirely removed from the technical context of the oil and gas business, as though Congress were using it in the colloquial or everyday sense concerning the production of wheat, or corn, or cattle or shirts. Finally, it seems to me to say that since, in the determination of jurisdictional sales, Phillips Petroleum Company v. State of Wisconsin, 1954, 347 U. S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, is thought by many to have ridden rough-

shod over the same exemption, everything fell before that awesome decision even though the subject of our case is not *sales*, but *production* which is the essence and the exact subject of the exclusion.

The law may be imperfect. What Congress has prescribed may be something less than completely effective. But when Congress has spoken in terms of the strongest prohibition that "the provisions of this act * * * shall not apply * * * to the production * * * of natural gas," it is our duty faithfully to apply this exclusion. It is not our province either to ignore these positive terms or gloss over them with some easy construction under any supposed duty that "we must give to the terms the meaning that will effectuate and not the one that would frustrate the purpose of the law." That purpose is described in the opinion as "the intent * * * to regulate * * * interstate sales"—a statement which is, to say the least, an oversimplification since that purpose is in the very same sentence [1] of the Act which imposes this positive prohibition.

## I.

The Court seems preoccupied with the omission of the term "facilities" from the production of natural gas exclusion of Section 1(b). It twice points out that in contrast to the immediately preceding phrase "or to the local distribution of natural gas or to the facility used for such distribution," reference is made to facilities where as this language is absent in the phrase applicable here, "or to the production or gathering of natural gas." The Court acknowledges, as it must, that this language of the exclusion has been construed expressly to cover *facilities* of production or gathering.[2]

**1.** Section 1(b) provides:

"(b) The provisions of this act shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transporta-

tion or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas." 15 U.S.C.A. § 717 (b).

**2.** The Court's opinion states: "Although not specifically so providing, the language

But this innocuous and casual presentation creates the impression that these interpretative decisions, both on the meaning of the term and its general purpose, are of remote and only indirect interest. I do not think they either may or ought to be so quickly dismissed by this deferential curtsy.

I think these interpretative decisions are of critical importance. A brief consideration of them is convincing that the Supreme Court regards the words of the § 1(b) exemption as much a part of the Act as the affirmative grant of power.

That "production" included the facilities reasonably required for it has long been settled through the emphatic language of F. P. C. v. Panhandle Eastern Pipe Line Company, 1949, 337 U.S. 498, 504–505, 69 S.Ct. 1251, 1256, 93 L.Ed. 1499:

> "The Commission seeks to distinguish between the activities of production and gathering, such as drilling, spacing wells, or collecting gas, and the facilities, such as reserves and gas leases, used therefor and argues that only the former were excluded from the coverage of the Act. In support of this position it is pointed out that the section specifically exempts both the local distribution and the facilities used therefor while it makes no mention of the facilities used for production or gathering. In the face of the unambiguous language of the Act and its legislative background, we cannot ascribe such a narrow meaning to the words, 'the production or gathering of natural gas.' In Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 603, 65 S.Ct. 829, 839, 89 L.Ed. 1206, we said that this phrase comprehended the producing properties and gathering facilities of a natural-gas company. We now adhere to this natural and clear meaning of the words and their obvious expression of congressional intent."

This Court's off-hand suggestion that a "strong argument can be made under the alternative proposition in light of the holding by the Supreme Court in Phillips Petroleum Company v. Wisconsin" assumes that since the Supreme Court found *sales* not affected by the § 1(b) exclusion so that "production" was swallowed up by anything amounting to an "interstate sale" hardly finds support in anything which the Court there said.

> "In Federal Power Commission v. Panhandle Eastern Pipe Line Co., 337 U.S. 498, 505, 69 S.Ct. 1251, 1256, 93 L.Ed. 1499, [1505], we observed that the 'natural and clear meaning' of the phrase 'production or gathering of natural gas' is that it encompasses 'the producing properties and gathering facilities of a natural-gas company.' Similarly, in Colorado Interstate Gas Co. v. Federal Power Commission, 324 U.S. 581, 598, 65 S.Ct. 829, 837, 89 L.Ed. 1206, [1220], we stated that '[t]ransportation and sale do not include production or gathering,' and indicated that the 'production or gathering' exemption applies to the physical activities, facilities, and properties used in the production and gathering of natural gas. Id., 324 U.S. at pages 602–603, 65 S.Ct. at page 839. See also Federal Power Commission v. Hope Natural Gas Co., 320 U.S. 591, 612–615, 64 S.Ct. 281, 292–294, 88 L.Ed. 333 [350–52]; Peoples Natural Gas Co. v. Federal Power Commission, 75 U.S. App.D.C. 235, 127 F.2d 153; cf. United States v. Public Utilities Commission, 345 U.S. 295, 307–311, 73 S.Ct. 706, 713–716, 97 L.Ed.

of this exemption has, as to other types of facilities, been held to cover facilities of production or gathering. See Federal Power Commission v. Panhandle Eastern Pipe Line Company, 337 U.S. 498, 504–505, 69 S.Ct. 1251, 93 L.Ed. 1499. See

also Deep South Oil Company of Texas v. Federal Power Commission, 5 Cir., 247 F.2d 882, 889." And see the parenthetical phrase "(which does not expressly include facilities for production and exemption)" at note call 3.

1020." Phillips Petroleum Company v. State of Wisconsin, 1954, 347 U. S. 672, 678, 74 S.Ct. 794, 797, 98 L. Ed. 1035.

More important, the Court has always regarded the exclusions in § 1(b) as absolute prohibitions on basic power in order to effectuate a Congressional purpose not only to cover some areas, but, just as positively, not to cover or intrude upon others:

"Without entering upon another review of its legislative history, suffice it to say that the Natural Gas Act did not envisage federal regulation of the entire natural-gas field to the limit of constitutional power. Rather it contemplated the exercise of federal power as specified in the Act, particularly in that interstate segment which the states were powerless to regulate because of the Commerce Clause of the Federal Constitution. The jurisdiction of the Federal Power Commission was to complement that of the state regulatory bodies. Accordingly, Congress in § 1(b) of the Act not only prescribed the intended reach of the Commissioner's power, but also specified the areas into which this power was not to extend.

❊    ❊    ❊    ❊    ❊    ❊

[quoting § 1(b)]

" 'This section determines the Act's coverage and does so in the light of the situation existing at the time. Three things and three only Congress drew within its own regu-

latory power, delegated by the Act to its agent, the Federal Power Commission. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.' Panhandle Eastern Pipe Line Co. v. Public Service Commission, 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128 [137]. The Act, moreover, expressly exempts from its coverage (1) any other transportation or sale of natural gas; (2) the local distribution of natural gas; (3) the facilities used for local distribution; and (4) the production and gathering of natural gas." F. P. C. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 502–504, 69 S.Ct. 1251, 1255, 93 L.Ed. 1499.

This but echoed the earlier statements in Interstate Natural Gas Company v. F.P.C., 1947, 331 U.S. 682, 690, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742, 1748:[3]

"Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern. It was the intention of Congress to give the States full freedom in these matters."

The last part of § 1(b) is as important as the first. The tail is as important at the head. While the purpose was to regulate interstate transportation and interstate sales of gas, the policy was

3. This Court in that same case, 5 Cir., 1946, 156 F.2d 949, 951, had earlier stated about § 1(b) and the Act:
"Unnecessarily perhaps but in the interest of making clear that the act gave jurisdiction only over sales and transportation of the kind described in it, it used language removing from any doubt that the Commission was not to have jurisdiction over properties used for production and local distribution or the activities of production and gathering. It did this by expressly providing that the act should not apply 'to the facilities used for such [i. e. local] distribution or to

the production or gathering of natural gas.' "
Just a year ago in the context of wellhead sales, we again voiced the meaning of the exclusion in terms of an absolute prohibition of power:
"The exemption of production and gathering merely means that the physical activities, facilities and properties used by petitioner in the production and gathering of natural gas are not within the commission's power of regulation." Deep South Oil Company of Texas v. F.P.C., 5 Cir., 1957, 247 F.2d 882, 889.

equally firm that the Commission was to have no power whatsoever over production or gathering of natural gas. The one is as much the Congressional purpose as the other. Congress may act in both an affirmative and negative way. What it means not to cover or invade is frequently as significant at the limited field it undertakes to enter. Libby, McNeill & Libby v. Mitchell, 5 Cir., 1958, 256 F.2d 832, 834; Maneja v. Waialua Agricultural Co., 1955, 349 U.S. 254, 260, 75 S.Ct. 719, 99 L.Ed. 1040; see also I.C.C. v. Dunn, 5 Cir., 1948, 166 F.2d 116; I.C.C. v. Allen E. Kroblin, Inc., D.C. N.D.Iowa, 1953, 113 F.Supp. 599, affirmed 8 Cir., 1954, 212 F.2d 555.

It matters not what happens to regulation, it matters not how some assumed policy will be thwarted or impeded. The simple truth is that the Commission cannot take any step, impose any requirement, or condition in any way any activity which is directly a part of the "production * * * of natural gas" or directly concerned with "facilities and properties used" in the production of natural gas.

## II.

This Court undertakes to find that at the time of delivery under these sales by Continental to El Paso production had ended. This will be analyzed in Part III. In my judgment, for this Court to state, "We think * * * this record discloses that there are facilities for the sale of the gas that are not facilities of production" is to disregard the function of this Court in the review of actions by the Federal Power Commission.

We are not the Federal Power Commission. We are not equipped to be the Federal Power Commission and we have not been commissioned to be the Federal Power Commission. We are not to find facts respecting matters committed to the Federal Power Commission. "The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." § 19(b), 15 U.S.C.A. § 717r(b). We are to *review* the fact decisions within a limited area and then determine on such fact findings whether the Commission has fairly applied the law. That the opinion of this Court is an invasion of the fact-finding function of the Federal Power Commission and is the assertion of a right to substitute our judgment for that of the expert body is demonstrated by what the Commission did and did not do in this proceeding below.

The Commission, in its original order [4] overruling the Examiner's contrary findings, after first disposing of the jurisdictional sales issue no longer in this case then turned "to the question of whether there are facilities involved here to be certificated." The premise upon which the Commission proceeded was almost immediately stated. "The Court in upholding our position has clearly shown that 'facilities' apply to those facilities which serve the function of effecting the sale. J. M. Huber Corp. v. F. P. C., 236 F.2d 550, 556, cert[iorari] denied 352 U. S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324." This was followed by an assertion which equated the problem with one of *sales* in total disregard of *production*.[5] Right on the heels of this was a reiteration of the

4. September 6, 1957, Docket No. G-6346.

5. The report went on to state:
"Obviously in this case there is a facility called a 'Christmas tree' between the producing well and the point of delivery to El Paso. It is apparent that under the Act a line must be drawn between sales facilities which must be certificated under Section 7(c) and other facilities without which a sale could not be made but which are not sales facilities within the meaning of Section 7(c) and for the

operation of which no certificate is required. Drawing such a line requires consideration of the provisions and objectives of Section 7, of appropriate means for the attainment of the objectives of this section, of the characteristics of the producing segment of the natural-gas industry, of the administrative practicalities involved, and of such other circumstances as may exist in a given case."
As can be seen, Section 1(b) was not even given the barest mention.

basic approach. "In this regard, Section 7(c) in referring to 'facilities therefor' and 'such facilities' reasonably applies to those facilities which serve the function of effecting the interstate sale or interstate transportation as the case may be."

The climax of the Commission's order was then immediately reached in terms which disregarded altogether the idea of *production*. "Applying these principles to the particular facts of Continental's operations, it is apparent that such portions of the 'Christmas tree' that are owned by Continental and serve to contain the gas at the point of delivery are facilities for effecting the sale of gas in interstate commerce, *regardless whether they serve also to effect production*. * * 'Agere sequitur esse' says the logic primer: What a thing is is determined by what it does. It cannot reasonably be contended that the sale in this instance can be effectuated without the aid of Continental's facilities herein involved." [6] (emphasis supplied)

Despite vigorous well-organized exceptions which pinpointed the contentions advanced by Continental's petition for rehearing as required under Section 19 (b), 15 U.S.C.A. § 717r(b), the extended order of the Commission denying application for rehearing is likewise noncommittal on the question of *production*. The Commission pointed out, respecting certification of facilities, that "these are the facilities, in the words of Section 7 (c) of the act, which are for the 'sale of natural gas, subject to the jurisdiction of the Commission.'" What were these facilities was then immediately identified in terms wholly apart from production. "The Commission has in this case, however, limited its certificate very narrowly to the most immediate facilities, part of the Christmas tree, owned by Continental, and serving to contain the gas at the point of delivery."

And, as the very last word of the Commission on this subject in this proceeding, it again makes clear that the Commission has not undertaken to determine when production has ended or whether production is still going on or where production ends. Consistent with its initial decision, it regards "facilities" as coextensive with the needs for delivery for sale wholly apart from considerations of production. All that "is material" the Commission states, "is that Continental owns facilities by means of which it possesses, delivers, and sells the gas and it is those facilities that are subject to this Commission's jurisdiction." [7]

So far as the Commission has determined, any and all equipment required

---

6. In the formal findings section of the order, the Commission found: "2. The sale of natural gas hereinbefore described * * * is made in interstate commerce subject to the jurisdiction of the Commission, and such sale by Continental, *together with the operation of any facilities (which are included in the Christmas tree involved herein)* subject to the jurisdiction of the Commission necessary therefor, are subject to the requirements of subsections (c) and (e) of Section 7 of the Natural Gas Act." (emphasis supplied) In the formal order section the Commission ordered: "(A) A certificate of public convenience and necessity is hereby issued * * *, authorizing the sale by Continental of natural gas in interstate commerce for resale, together with the continued operation of *any facilities (which are included in the Christmas tree involved herein)*, subject to the jurisdiction of the Commission, *used for the sale* of natural gas in interstate commerce, as hereinbefore described * * *." (emphasis supplied)

7. This quoted excerpt gains significance from its context.

"With respect to the Christmas tree Continental objects to our describing it in the original order as a facility between the producing well and the point of delivery, saying that the Christmas tree is part of the well. Whether the Christmas tree, in which delivery is made, is technically a part of the well is immaterial. The record clearly sets forth the physical facilities and the exact point of delivery. What is material is that Continental owns facilities by means of which it possesses, delivers and sells the gas and it is those facilities that are subject to this Commission's jurisdiction."

218

"to contain the gas at the point of delivery" is a facility for such sale and subject to the Commission. It is entirely immaterial whether that equipment or appliance or its use is in *production* or whether when Continental *possesses* the gas, the process of possessing is simultaneously the process of production.

What the Commission does not find, this Court undertakes to do. This is beyond our statutory function.

### III.

Finding an essential fact of this character is not only without statutory warrant. It is, with all deference to my Brothers who are articulate, conscientious and able juridical craftsmen, beyond the competence of us as Judges. This is at least so on this skimpy record which, apart from a photograph and the expert testimony the Court derides, note 5 of Court's opinion, as self-serving gossip, does not contain any evidence from which we, as non-technical men, could proceed to arrive at any such pronouncement of our own concerning the highly complicated field of gas engineering and production operations. Unless we have record facts or claim an omniscience which my modest Brothers would disavow, see Wright, The Doubtful Omniscience of Appellate Courts, 41 Minn. Law Review 751, I am at a loss to understand where the Court gets the wisdom or the experience or the information upon which to make this critical fact finding. Indeed, the statements are, in my view, not only bad law, they are bad engineering.

These deliverances find their climax in what I can only regard as surprising. After a supposititious concession that the lower, first, master valve might be used to "produce" the gas, the Court makes this remarkable statement. "Even including this valve as a facility of production may be argued to be conceptually an *anomaly* because, physically, production and delivery can be accomplished *without any valves at all.*" (emphasis added) With deference to my distinguished colleagues, the anomaly, in my judgment, is that at this day and time such a statement would or could be made. Indeed, the statement is self-defeating for it is followed by one which affirms that in the practice of the industry, Christmas tree valves are used as an essential step in production. The Court states, "We fully recognize that for safety of *operation,* making adequate provision for repairs, etc., the unbroken custom in the industry is to contain the gas by a complex of two valves and associated equipment."

With today's high pressure gas reservoirs from which the long line transmission pipe lines carry essential fuel to the metropolitan consumers across the land, I cannot conceive how a gas well could be brought in without valves. It could not be because the conservation authorities would not permit it.[8]

Even in the figure of speech used by the Commission that it is a question of reducing the gas to possession for sale, this is an essential part of the process of production. For gas is not produced unless it is effectively reduced to the control of the one undertaking to dispose of it. Every facility which Continental owns—this includes the Christmas tree to the top of the 4-inch valve—is essential to production. This is established by uncontradicted proof. The proof is not that set forth in note 5 of the Court's opinion. There the witness was undertaking merely to describe what the industry considered the term "production" to mean as it might bear on ascertaining the Congressional intent in the selection of that terminology. In describing the process of drilling the

8. Although this was a New Mexico well, the rules of the Texas Railroad Commission are typical. See Rule 44, "A blow-out-preventer control head and other connections for keeping the well under control at all times shall be installed as soon as surface casing is set." Rule 45, "All wells shall be equipped with a Bradenhead." Rule 48, "All wells shall be equipped with adequate chokes, or beans, to properly control the flow thereof."

wells in this field, his answers are un-challenged. Considering that the Federal Power Commission has an abundant staff of outstanding experts in the field of gas engineering and production, the failure of the staff counsel to offer any rebuttal seems almost decisive. This witness, a senior production engineer for Continental, a graduate engineer with nearly ten years' experience in the field with gas problems and gas operations in Texas and New Mexico, was positive that the Christmas tree comprising the two master valves was indispensable:

> "Q. What is the purpose of the two master valves? A. The two master valves are necessary to the production of the gas. Both of these valves were installed when the well was completed in January of 1949. Their installation was a necessary part of the completion of the well * * *."

It was equally uncontradicted through him that this equipment was installed in all of Continental's wells numbering about fifty in that area. Here, of course, it was installed when the well was completed. The well was not completed until the Christmas tree was installed. This was six months before the sales contract was ever entered into.

When, even in our technical ignorance, we take into account that high pressures are involved in most modern gas wells, that conservation rules forbid the waste of gas into the atmosphere, that wells can be irretrievably damaged by improper or inadequate pressure controls during the critical stage of bringing them in, that lives would be needlessly exposed to serious hazards, it is plain to me that we cannot engage in fact findings of the kind undertaken by the Court here.[9]

Indeed, I do not think that my cautious Brothers would have undertaken this ex-cursion had they not first have found (or assumed) a basis for considering *production* in its ordinary, common usage. For clearly, what the Court says does not follow if the term is used in the sense of the oil and gas field. For example, the Court states, "In the ordinary language of purchase and sale of a product where it is in deliverable form the stream of gas is, in a sense, 'produced' at the latest after it has passed through the first master valve. * * *." Again, it states, "but this does not change the fact that in the *ordinary sense of the terms* production of the gas has been completed at or just above the surface of the ground where it is physically deliverable but then is shut in until delivery commences."

To support this approach, the Court frankly states that "our duty here is not to determine what is generally understood in the industry, in the resolution of other relationships, is meant by 'production.'" It is, rather, the Court goes on to say "to determine what Congress meant by the term." Reading § 1(b) as though it contained only the first part of the sentence and disregarding altogether the exclusionary phrases at its end, the Court then proceeds to find that the sole Congressional purpose was "to regulate these interstate sales." This causes the Court then to reject the industry context and adopt a construction of "production" which "is in line with ordinary non-technical usage" so that it will "effectuate and not * * * frustrate the purpose of the law."

But Congress was not legislating in an atmosphere of "ordinary non-technical usage." The abundant legislative history canvassed by the many Supreme Court cases reveals an articulate awareness of the complexities of this whole business. The object of § 1(b) was clearly to define the purpose to regulate

---

9. I should emphasize here that what little information I may have absorbed in the midst of an oil and gas economy does not fit me to arrive at conclusions on which legal action may be based. This pinpoints the precise difference between me and my colleagues. They use their general knowledge to reach and declare a finding, i. e., non-production. From my resources I do not undertake to find the opposite. I conclude only that the record does not warrant their conclusion.

transportation and sale and companies engaged in such transportation or sale. This was done against the background fully known to Congress that at one end of the process was the production of the natural gas, that at the other end was the consumer, and in between were those who transported and distributed it. As pointed out in Part I above, the Court has been emphatic in ascribing an intention to Congress to exclude those matters which relate to the local production activities traditionally reserved to states for their exclusive control.

We are told that § 1(b) exclusion is a provision " * * * that * * * precludes the Commission from any control over the activity of producing or gathering natural gas. * * *." Colorado Interstate Gas Co. v. FPC, 1945, 324 U. S. 581, 603, 65 S.Ct. 829, 839, 89 L.Ed. 1206. Two years later this was reiterated in Interstate Natural Gas Company v. FPC, 1947, 331 U.S. 682, 690, 67 S. Ct. 1482, 1487, 91 L.Ed. 1742. "Clearly, among the powers thus reserved to the States is the power to regulate the physical production and gathering of natural gas in the interests of conservation or of any other consideration of legitimate local concern. It was the intention of Congress to give the States full freedom in these matters."

Within another two years this was re-emphasized in FPC v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 509–13, 69 S.Ct. 1251, 1258, 93 L.Ed. 1499. "To accept these arguments springing from power to allow interstate service, fix rates and control abandonment would establish wide control by the Federal Power Commission over the production and gathering of gas. It would invite expansion of power into other phases of the forbidden area. It would be an assumption of powers specifically denied the Commission by the words of the Act as explained in the report and on the floor of both Houses of Congress. The legislative history of this Act is replete with evidence of the care taken by Congress to keep the power over the production and gathering of gas within the states."

How Congress expected to preserve the absolute freedom of the States in matters concerning production unless that term was used in the context of that industry is nowhere made clear by my Brothers. If Congress were to adhere to its purpose, carefully to regulate some but not all of the natural gas moving or dedicated to move in interstate commerce, it was required to prescribe the boundary limits of each in terms of the business and industry to be regulated. That is the usual, not the extraordinary, principle of statutory construction long ago set forth in Unwin v. Hanson, [1891] 2 Q.B. 115, 119, approved in O'Hara v. Luckenback Steamship Co., 1926, 269 U.S. 364, 370–371, 46 S.Ct. 157, 160, 70 L.Ed. 313:

"If the act is one passed with reference to a particular trade, business, or transaction, and words are used which everybody conversant with that trade, business, or transaction, knows and understands to have a particular meaning in it, then the words are to be construed as having that particular meaning, though it may differ from the common or ordinary meaning of the words."

And see 50 Am.Jur., Statutes § 277 (1944).

What is "production of natural gas" is to be determined in the light of the actual substantive conditions and engineering-business requirements of that great field of scientific mechanical activity. Such activity is not to be assayed by Judges who, learned in the law, have naught but the limited technical experience and cumulative knowledge of the ordinary person.

Judged by the standards of the industry, not only by what was said and uncontradicted, but by what was done on a large scale in this very field, the Commission could only find that all of Continental's facilities were essential to and a part of the production of gas.

## IV.

The Court's action and opinion is portentous. It is so precisely because it is based on an erroneous assumption and an equally erroneous construction. It assumes that we are fact finders to supplant or supplement the expert agency. It finds the capacity to cope with this problem by relieving it of all technical complexities and casting it in the mold of the ordinary meaning of *production*.

The Court finds "that in the *ordinary sense of the term* production of the gas has been completed at or just above the surface of the ground where it is physically deliverable \* \* \*." (emphasis in the original) Tying this in to the point of delivery (at the very extreme end of Continental's 4-inch master valve and at the very beginning of El Paso's swage), the Court has necessarily adopted the approach of the Commission that facilities for the sale of natural gas subject to the jurisdiction of the Commission are those "serving to contain the gas at the point of delivery." That it means to champion this construction is likewise established by the Court's unqualified approval, both here and in Sun Oil Company v. FPC, 5 Cir., 1959, 266 F.2d 222, of J. M. Huber Corp. v. FPC, 3 Cir., 1956, 236 F.2d 550, 556 and Saturn Oil & Gas Co. v. FPC, 10 Cir., 1957, 250 F.2d 61, 69, the latter of which states: "To us it is clear that facilities necessary to effect a sale of gas in interstate commerce are facilities used in interstate commerce and are within the jurisdiction of the Commission. This would seem to be the plain intent of section 7(c). The Third Circuit has so held in J. M. Huber Corp. v. Federal Power Commission, 3 Cir., 236 F.2d 550, 556."

The vice of this rationale is compounded by the Court's interpretation of "production" or "production facilities" in terms of ordinary non-industry connotation. But even without this, if the test is to be stated in terms of that piece of equipment which is needed to effectuate the sale or contain the gas at the point of sale delivery, then there is in fact no physical limitation. In those terms the master valve (whether upper or lower, or both) does not alone contain the gas. The master valves are ineffective without the continuation of the leakproof surface casing, the production casing or many other parts of the well, all of which operate simultaneously and indispensably to bring and hold the gas under effective control.

That is critical since § 7(c) requires certification of facilities which are to be constructed or extended. And once a little intrusion is made into the forbidden 1(b) area of production, it is only logical to expect (and justify) application of the full reach of this concept. It stops in a given well where, but only where, the particular piece of equipment may be said to directly assist in the containment of the gas at delivery point. Worse, it means that by the force of § 7(c), the drilling and equipping of a new well could only be done by express approval of the Commission.

We and all others have now firmly held that on the commencement of the first jurisdictional sale, the Commission's power attaches at least to the sale. The Court by our present opinion holds that simultaneously power attaches to *some* piece of gas well equipment. If the jurisdictional sale setting all of this Federal control in motion is in the common form of a long-term dedication-of-reserves-contract by which the mineral owner undertakes to develop a field and deliver all production to the long line pipe line purchaser, the result will be that the drilling of additional wells may not be done except on Commission terms and approval. In such a situation the "new" well would, of course, be the means by which to effectuate the sale of the gas. Since this would constitute "the construction or extension of any *facilities*" for the sale of natural gas subject to the jurisdiction of the Commission, and would result in the acquisition and operation of "such *facilities* or extensions thereof," it would, as § 7(c) demands, positively require that the Commission issue a certificate of public

convenience and necessity "authorizing such acts or operation."

Combining this opinion and Sun Oil, this day decided, this Court binds a gas well owner to *produce* gas for as long as the Commission prescribes. Neither the length of the contract nor the production-nature of the facility by which the "service" (sale) is performed are an effective limitation. Until nature shuts off the gas the Commission is the perpetual regulator from whose power the Commission's own brief says, "* * * there is no * * * hiding place."

Congress did not mean to invest its creature with these scriptural powers (Psalms 139:7, 8). Section 1(b) draws the line at production.

I respectfully dissent.

