**J. M. HUBER CORPORATION,**
Petitioner,

v.

**FEDERAL POWER COMMISSION,**
Respondent.

No. 11799.

United States Court of Appeals
Third Circuit.

Argued June 18, 1956.

Decided Aug. 31, 1956.

Henry H. Fowler, Washington, D. C. (Robert Martin, Fowler, Leva, Hawes & Symington, Washington, D. C., on the brief), for petitioner.

William L. Ellis (Willard W. Gatchell, Gen. Counsel, Harry L. Albrecht, Washington, D. C., on the brief), for respondent, Federal Power Commission.

Patrick J. McCarthy, Omaha, Neb., for Northern Natural Gas Co., intervenor (Lawrence I. Shaw, F. Vinson Roach, Omaha, Neb., Justin R. Wolf, Washington, D. C., on the brief).

Before MARIS and McLAUGHLIN, Circuit Judges, and VAN DUSEN, District Judge.

McLAUGHLIN, Circuit Judge.

Petitioner, a New Jersey corporation, produces and gathers natural gas from twelve wells in Carson County, Texas, part of the West Panhandle Field. Gas from eleven of the wells flows into a T shaped control system of three valves. The stem of the "T" consists of two feet of pipe and a valve with which intervenor Northern's pipeline connects. Since April 21, 1936, Huber has been selling

gas from those wells under a contract (as amended) to Northern at the connecting delivery point at well head pressures. Northern transports the gas to its main line transmission facilities where it continues on in interstate commerce transmission until delivered for consumption to ultimate customers or is sold for resale to ultimate customers. The contract is for the life of petitioner's leasehold interests in the producing acreage and as long as gas is taken from it in paying quantities. The remaining time under the contract terms is estimated at approximately ten years.

On June 7, 1954, the Supreme Court, in Phillips Petroleum Co. v. State of Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, held that an independent natural gas producer who, though not engaged in the interstate transmission of gas from the producing fields to consumer markets, does sell to interstate pipeline transmission companies which transport and resell the gas to consumers and local distributing companies in various states, is a "natural-gas company" within the meaning of the Natural Gas Act, 15 U.S.C. § 717 et seq. As a result, the Commission prescribed regulations covering such companies. Petitioner, under protest, complying with these, filed an application for a certificate of public convenience and necessity under Section 7(a) of the Act covering its sales to Northern. It also filed its contract with Northern as a rate schedule under Section 4(c), together with a notice to Northern of cancellation of that agreement. The ground for cancellation alleged that the Commission has established a price for Huber's gas less than the contract price with Northern which permitted Huber to invoke the escape clause in the agreement.[1] The Commission rejected the notice "* * * in so far as it purports to effect an abandonment of a sale or service subject to the jurisdiction of the Commission without express permission and approval first had and obtained as required by Section (7) of the Natural Gas Act * * *." Prior to the hearing Huber filed a "Withdrawal" of its application for the certificate which stated that if this is not allowed it wished to amend its application, setting out that it is "not willing to do the acts and perform the service proposed and is not willing to conform to the provisions of Section 7(e) of the Natural Gas Act and the requirements, rules and regulations of the Federal Power Commission thereunder, and under the provisions of said Section 7(e) of the Natural Gas Act it is mandatory that the Federal Power Commission deny this application for certificate. J. M. Huber Corporation is not willing to accept a certificate covering the sale previously described herein with or without conditions appended to the issuance thereof. Huber is willing eo instante, upon denial of this application by the Commission, to cease delivering natural gas to Northern Natural Gas Company." Following completion of the hearings Huber filed a withdrawal of its notice of cancellation of the rate schedule based on its Northern contract. It stated that it was taking this action because it had erroneous-

---

1. The agreement between Huber and Northern allowed the former to add to the purchase price of the gas any Texas production tax. It also gave Huber the right to cancel if a government regulatory body establishes a purchase price less than that of the contract. The Texas production tax was increased on September 1, 1954. Huber claimed that Commission Order 174–A prevented it from receiving the amount of the increase from Northern and the latter from paying it. Acting on that theory Huber served Northern with a notice of cancellation, effective March 1, 1955.

The claim is without merit. The Commission has never reduced the price of the gas below the terms of the contract. Huber has simply refused to follow the mechanics of obtaining Commission approval to add the increased state tax to the Northern purchase price. See Section 154.94 of the Regulations of the Commission adopted under its Order 174–A. It is not denied that without exception, the Commission has granted all rate-increase proposals by independent producers which were based on increased Texas-gross-production tax payments.

ly assumed its sale to Northern was within the jurisdiction of the Commission.

Prior to any decision in the matter Huber advised the Commission it was terminating deliveries to Northern March 10, 1955. The Commission obtained a temporary restraining order against the threatened move in the United States District Court, District of New Jersey and thereafter in that suit Huber was enjoined from discontinuing its sales for resale to Northern pending final Commission decision in the present issue.[2] Appeal from that decision is pending before us.

The decision of the Presiding Examiner in this cause was filed June 14, 1955. It held that on February 7, 1942 Huber was engaged in the sale of natural gas subject to the jurisdiction of the Commission over the routes described in its application for a certificate of public convenience and necessity and exhibits attached thereto, and has so operated since that time; that the sale of gas from the eleven wells is made in interstate commerce and subject to the jurisdiction of the Commission; that the T valve and pipe system above referred to are necessary Huber facilities for the sale of the gas from the said wells; that the sale together with the operation of the said facilities is subject to Section 7 (c) of the Act and of Part 157 of the Commission's regulations; that the Huber gas supply underlying the eleven wells acreage is not so depleted as to render unwarranted further sales by means of the referred to facilities and that neither present nor future public convenience and necessity permits the abandonment by Huber of said facilities or the sale rendered by means of such facilities.

By an appropriate order (subject to review by the Commission), filed at the same time, a certificate of public convenience and necessity was issued to Huber and its application to abandon its sale of natural gas to Northern was denied, except as it related to the twelfth well which is not material to this litigation. Permission to abandon the T system facilities was also refused. On October 6, 1955 the Commission affirmed the decision in its entirety. An order denying the application for rehearing was issued November 29, 1955. The petition for review was thereafter filed.

The Phillips decision makes it very clear that Huber is a natural gas company directly within the jurisdiction of the Commission under the Act by reason of its sale of natural gas to Northern, admittedly a sale in interstate commerce of natural gas for resale. Huber would seem to accede to the jurisdictional view for its attempt to cancel the Northern contract, as has been noted, was based upon the Commission's action in its 174–A order which Huber claimed established a price for the contract gas less than the amount fixed by the contract itself. In so doing, Huber recognized the right of the Commission to control the price of the gas. That the cancellation maneuver was not justified and for its own purposes in no way detracts from Huber's plain acceptance of the authority of the Commission. Irrespective of that, in almost identical circumstances the Supreme Court held Phillips, just such an independent natural gas producer, to be a "natural-gas company" within the Act and that its sales in interstate commerce of natural gas for resale are subject to the jurisdiction of, and rate regulation by the Commission. In that action as here the contention was made that the sales by Phillips were a part of the "production or gathering of natural gas" and controlled by the second clause of Section 1(b) of the Act which provides that the authority of the Commission does not extend "to the production or gathering of natural gas". The Commission had found that the sales by Phillips were part of the production and gathering process or at least an exempt incident thereof but the Supreme Court at page 678 of 347 U.S. at page 797 of 74 S.Ct. flatly rejected that position saying:

2. D.C.D.N.J.1955, 133 F.Supp. 479, 488.

"We are of the opinion, however, that the finding is without adequate basis in law, and that production and gathering, in the sense that those terms are used in § 1(b), end before the sales by Phillips occur."

■ The first clause of Section 1(b) of the Act establishes its application "to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale * * *." And the Supreme Court said in Interstate Natural Gas. Co. v. Federal Power Commission, 1947, 331 U.S. 682, 690–691, 67 S.Ct. 1482, 1487, 91 L.Ed. 1742, regarding the jurisdiction thus conferred that "Exceptions to the primary grant of jurisdiction in the section are to be strictly construed." The assertion that the sale to Northern is part of Huber's gathering process and consequently not controlled by the Commission is almost identical with the unsuccessful argument urged in that cause by Interstate.

The suggestion that the legislative history shows that Congress intended to regulate only the interstate pipelines and that the Northern sale should be construed as an integral part of Huber's business of producing and gathering was also advanced in Phillips. The Court significantly and sweepingly disposed of that thought by saying:

"Rather, we believe that the legislative history indicates a congressional intent to give the Commission jurisdiction over the rates of all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company."

And at page 685 of 347 U.S. at page 800 of 74 S.Ct. the Court laid down the general guiding principle with reference to the type of sale by an independent producer with which we are dealing in this petition. The court said:

"Regulation of the sales in interstate commerce for resale made by a so-called independent natural-gas producer is not essentially different from regulation of such sales when made by an affiliate of an interstate pipeline company. In both cases, the rates charged may have a direct and substantial effect on the price paid by the ultimate consumers. Protection of consumers against exploitation at the hands of natural-gas companies was the primary aim of the Natural Gas Act. Federal Power Commission v. Hope Natural Gas Co., supra, 320 U.S. [591], at page 610, 64 S.Ct. [281] at page 291 [88 L.Ed. 333]. Attempts to weaken this protection by amendatory legislation exempting independent natural-gas producers from federal regulation have repeatedly failed, and we refuse to achieve the same result by a strained interpretation of the existing statutory language."

■ Though admitting that its T valve system facilities are used in its sale to Northern and that there can be no sale unless the seller's and the buyer's facilities connect, Huber seeks to derive some support for the theory that its valves and pipe segment are gathering facilities from the Interstate opinion, supra, but that decision specifically stated at page 691 of 347 U.S. at page 1487 of 67 S.Ct., "It is not sufficient to defeat the Commission's jurisdiction over sales for resale in interstate commerce to assert that in the exercise of the power of rate regulation in such cases, local interests may be in some degree affected." There, the producer petitioner, like Huber, insisted its sales were a portion of the gathering operation. The court found it unnecessary to resolve the question of just where the gathering process concluded, whether at the place of sale or at some point prior to surrender of custody and passage of title. It held, at page 692 of 347 U.S., at page 1488 of 67 S.Ct. simply and effectively that "By the time the sales are consummated,

nothing further in the gathering process remains to be done."[3]

The Commission has found that the Huber's T valve system, its valves and the pipe, are facilities which are used to effect the sale of natural gas to Northern. This is a fact finding supported not only by substantial evidence on the whole case but, if not accepted by Huber, certainly not credibly contradicted. The Phillips decision makes such facilities, sales facilities. These are within the Commission's jurisdiction by Section 7(c) of the Act which reads:

"(c) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations."

And Section 7(b) of the Act directly prohibits the abandonment of those facilities except by means of the designated procedure which was not followed by Huber. The section reads:

"No natural-gas company shall abandon all or any portion of its facilities subject to the jurisdiction of the Commission, or any service rendered by means of such facilities, without the permission and approval of the Commission first had and obtained, after due hearing, and a finding by the Commission that the available supply of natural gas is depleted to the extent that the continuance of service is unwarranted, or that the present or future public convenience or necessity permit such abandonment."

For all of the above reasons, the Commission in its order of October 6, 1955 denying Huber's application to abandon its Northern contract, was within its jurisdiction under the Act.

While the above disposes of the basic problem in this appeal there are several minor points that should be passed upon.

Huber attacks the certificate allowed it under Section 7(c), maintaining that since it did not apply for the certificate within ninety days of February 7, 1942, the effective date of the amendment to Section 7(c), as called for by that amendment, there was no authority in the Commission to allow it.

We are satisfied the certificate was properly issued. The 1942 amendment to Section 7(c) prohibited all gas companies from engaging in the transportation or sale of natural gas subject to the jurisdiction of the Commission "unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations". The amendment further provided in its "grandfather clause" that as to companies so engaged on the effective date of the amendment the Commission would issue certificates for the particular route or routes without further proof of public convenience and necessity if applied for within ninety days after the effective date of the amendatory Act. But it was not until after the Phillips decision in 1954, and by reason thereof, that the Commission declared its jurisdiction over independent natural gas producers similar to Huber and by amendments to its Rules and Regulations required them on and after June 7, 1954 to obtain certificates covering transportation and sale of natural gas under the jurisdiction of the Commission. Following that Huber, on September 24, 1954, filed its application covering its sale to Northern.

The jurisdiction of the Commission over a natural gas company con-

---

**3.** Two other decisions cited by petitioner do not affect the instant issue. Connecticut Light and Power Co. v. Federal Power Commission, 1945, 324 U.S. 515, 65 S.Ct. 749, 89 L.Ed. 1150, involved local distribution and Federal Power Commission v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499, concerned the sale of gas leaseholds.

ferred by Section 4(b) of the Act does not depend on whether that company fulfills its obligation under 7(c) to obtain a certificate. There is nothing in 7(c) or any other part of the Act giving the slightest credence to that strange conception of the Commission's authority. On the contrary by Section 16 of the Act "The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this act." Huber was selling to Northern on February 7, 1942 and continued to do so through 1954 and down to and including the present time. As it now develops, jurisdiction by the Commission over independent producers was present in the Act throughout the period but it was not until the Supreme Court defined it in 1954 that the Commission considered itself justified in asserting that authority. There is no indication that its attitude prior to the Phillips decision was arbitrary or capricious and beyond doubt thereafter it functioned in accordance with the Supreme Court mandate. In the circumstances issuance of the application under Section 7(c) was within its authority. Petitioner's suggestion therefore that Section 7(e)[4] was the pertinent section under which to consider its application need not be examined at length. It is sufficient to say that 7(e) on its face relates to new service and not to that in effect on February 7, 1942, the date of the amendment to Section 7(c). Irrespective of Section 7(e), under the law and facts petitioner's unwillingness to accept its certificate offers no real problem. The jurisdictional sections of the Act, 1(b) and 7(b) obviously do not rely upon the certificate provisions of 7(c). The pertinent amendments to the latter did not come into existence until almost four years after Sections 1(b) and 7(b) had been enacted. In Section 7(c) as amended there is nothing about the need of a gas company accepting a certificate. As we see it, with the certificate properly issued, Huber's attempted defiance of the Commission's rightful exercise of its authority is of no importance.

■ As part of its main theme that the T system is a gathering facility, petitioner states it is so considered in the industry. The basis for this is the testimony of R. C. Lister who made it plain that he was not attempting any legal characterization. The true test is the use and service of the valves and pipe.

■ Huber also makes some point of Northern being uncertificated with the view of distinguishing the facts from the Phillips situation. Whether Northern did obtain a certificate for its facilities beyond Huber's delivery place depends upon the interpretation of a Commission order which issued a certificate to Northern under Section 7(c) of the Act, 3 F.P.C. 967. The Presiding Examiner rightly determined that he for the Commission need not pass on that question in this proceeding. Even assuming absence of the particular certification, that is, as he stated, "* * * no legitimate ground for the Commission permitting Huber to abandon its sale to Northern."

4. Section 7(e) reads:

"Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

Finally, petitioner attacks the power of the Commission under Section 7(b) to prevent it abandoning the Northern agreement as contrary to the Fifth Amendment. It bases this on the statement that it is unwilling to undertake the obligations of a regulated natural gas company in connection with its production, gathering and disposition of gas from the leases involved.

In the light of the Phillips opinion the argument comes too late. It is now firmly settled that petitioner's business includes the sale of natural gas in interstate commerce for resale and so is controlled by the Commission. Section 1(a) which is the Act's declaration of policy leaves no doubt that such selling is within its scope. It reads:

"As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is hereby declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest."

There is nothing in the record of argument to weaken the conclusion that selling natural gas for ultimate distribution to the public is affected with a public interest which makes federal regulation necessary.[5] Nor is there any sound indication that said business of Huber is not thus affected. Beyond question Congress has the power to regulate interstate commerce in natural gas.[6] And we are completely convinced that this includes authority to regulate abandonment of sales and of the facilities for sales. We think the sense of the Phillips decision is altogether opposed to permitting the Commission's control of sales to be nullified by the independent producer's abandonment of those sales at will. The money losses to distribution lines and to the ultimate consumers would be stupendous in actual equipment, etc., but a far greater loss would be the deprivation of the vital gas itself to the public. Eventually some sort of substituted service might be brought in at further cost and it in turn, because of opportunity for greater profit or the whim of the producer, might later abandon its sales. The resultant conditions need not be labored. The Commission under Section 1(a) above quoted has no greater duty than to prevent them.

Huber voluntarily entered into its contract with Northern. Though that agreement was prior to the statute, control legislation, including the abandonment clause, had been introduced the previous year.[7] The jurisdictional escape clause of the agreement strongly implies that the parties were alert to possible future express regulation.[8] In addition, and most important, service to the public was the foundation of the contract operation. That service was given. The public has relied on it through the years and is entitled to its fair continuance. To abandon it there must be Commission approval.

Apparently Huber could obtain more for its gas elsewhere. Whether it could or not the Commission will not force it to supply Northern at a confiscatory

---

5. See Federal Power Commission v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 582, 62 S.Ct. 736, 86 L.Ed. 1037.

6. Colorado Interstate Gas Co. v. Federal Power Commission, 1945, 324 U.S. 581, 65 S.Ct. 829, 89 L.Ed. 1206; Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S. Ct. 281, 88 L.Ed. 333; Federal Power Commission v. Natural Gas Pipeline Co., supra.

7. H.R. 5423, 74th Congress, introduced Feb. 6, 1935, Section 305(b).

8. In Nebbia v. People of State of New York, 1934, 291 U.S. 502, 534, 54 S.Ct. 505, 514, 78 L.Ed. 940, the Supreme Court said: " * * * if one embarks in a business which public interest demands shall be regulated, he must know regulation will ensue."

02

price. Actually there is a current proceeding before the Commission the purpose of which, as categorically stated for the Commission, is to deal fully and justly with petitioner's and Northern's rate problem.

The order of the Federal Power Commission will be affirmed.