336 F.2d 320
 M. H. MARR, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent (two cases).
SUN OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent (two cases).
CONTINENTAL OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
GENERAL CRUDE OIL COMPANY, Petitioner,
v.
FEDERAL POWER COMMISSION Respondent (two cases).
TEXAS EASTERN TRANSMISSION CORPORATION, Petitioner,
v.
FEDERAL POWER COMMISSION, Respondent.
 No. 20560.
 No. 20846.
 No. 20564.
 No. 20829.
 No. 20582.
 No. 20587.
 No. 20847.
 No. 20591.
 United States Court of Appeals Fifth Circuit.
 August 3, 1964.
 
 Jack D. Head, Lloyd F. Thanhouser, Houston, Tex., Herf M. Weinert, Beaumont, Tex., John T. Guyton, Shreveport, La., W. D. Deakins, Jr., W. M. Streetman, Houston, Tex., Robert E. May, Washington, D. C., Martin A. Row, Dallas, Tex., John A. Ward, III, Philadelphia, Pa., Joiner Cartwright, Beaumont, Tex., Donley C. Wertz, Dallas, Tex., Stanley M. Morley, Washington, D. C., Bruce R. Merrill, Houston, Tex., for petitioners Texas Eastern Transmission Corp., Continental Oil Co., Sun Oil Co., M. H. Marr, and General Crude Oil Co.
 Howard E. Wahrenbrock, Sol., Richard A. Solomon, Gen. Counsel, Israel Convisser, Atty., FPC, Washington, D. C., for respondent.
 Edward S. Kirby, Newark, N. J., Kent H. Brown, Albany, N. Y., Robert W. Maris, William T. Coleman, Jr., Philadelphia, Pa., for intervenors Public Service Commission of New York and United Gas Improvement Co.
 Before RIVES and BROWN, Circuit Judges, and GROOMS, District Judge.
 RIVES, Circuit Judge.
 
 
 1
 These are petitions to review certain opinions and orders of the Federal Power Commission pursuant to section 19(b) of the Natural Gas Act, 15 U.S.C. § 717r (b). The petitioners are M. H. Marr, Sun Oil Company, Continental Oil Company, General Crude Oil Company, and Texas Eastern Transmission Corporation. Unless otherwise noted, all of the petitioners with the exception of Texas Eastern will be referred to herein as "the assignors." The intervenors are the Public Service Commission of the State of New York, the United Gas Improvement Company, and the Public Service Electric and Gas Company.
 
 
 2
 In 1957 Texas Eastern, a natural-gas company owning and operating an interstate natural-gas transmission system, executed gas purchase contracts with the assignors to purchase their natural-gas production in the Rayne Field, Acadia Parish, Louisiana, at an initial price of 23.9¢ per Mcf, including state taxes of 1.3¢ per Mcf.[1] At that time the assignors filed applications with the Federal Power Commission seeking certificates of public convenience and necessity for the gas sales, and Texas Eastern applied for a certificate to expand its interstate pipeline system in order to receive and re-sell the gas. These sales contracts, however, were cancelled in 1958 shortly after the Third Circuit decision in Public Service Commission of State of New York v. F. P. C., 3 Cir. 1958, 257 F.2d 717, aff'd sub nom. Atlantic Refining Co. v. P. S. C., 1959, 360 U.S. 378, 79 S.Ct. 1246, 3 L.Ed. 1312 (popularly called CATCO), and the Commission permitted the assignors to withdraw their then pending certificate applications.
 
 
 3
 After the cancellation of the sales contracts, the assignors entered into agreements whereby they purported to assign or convey certain of their leasehold rights in the Rayne Field gas to Texas Eastern.[2] The Commission allowed Texas Eastern to amend its application so as to reflect the new agreements and in June 1959 unconditionally authorized the construction and operation of the proposed pipeline facilities. The opinion[3] approved the project without examining into the cost to Texas Eastern of the leasehold interests and noted that the Commission had no authority to issue a certificate directly authorizing the acquisition of the leases. The Public Service Commission of New York sought review of this order, and in Public Service Comm'n v. F. P. C., 1961, 109 U.S. App.D.C. 289, 287 F.2d 143, it was reversed and remanded by the District of Columbia Circuit. The court observed:
 
 
 4
 "Sales of natural gas by an independent producer are subject to Commission regulation under Sections 4 and 5 of the Natural Gas Act. Phillips Petroleum Co. v. State of Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035. But the Commission has been held to lack jurisdiction over gas leases. Federal Power Commission v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S.Ct. 1251, 93 L.Ed. 1499."[4]
 
 
 5
 Nevertheless, the court held that the Commission did have jurisdiction over the pipeline construction project and the transactions by which Texas Eastern would dispose of the gas, for the Commission has a responsibility to regulate the purchaser, "regardless of the status of the seller."[5] Taking into consideration the Supreme Court's decision in CATCO, supra, the court concluded that insofar as the Commission's order purported to pass favorably upon the pricing aspects of the gas lease acquisitions, it was unsupported by substantial evidence in the record. The court offered the Commission two options: (1) clarifying the order by disclaiming any approval of the purchase price, or (2) reopening the record to allow Texas Eastern to establish that the acquisition costs would be consistent with the public convenience and necessity. The Commission's order was reversed, and the matter remanded to the Commission for further proceedings not inconsistent with the opinion of the court.
 
 
 6
 On remand, the Commission chose to reopen the record. In these proceedings Commission counsel argued for the first time that the Commission had jurisdiction over the acquisition of the leases. The Examiner, however, rejected this contention.[6] Instead he recommended that Texas Eastern be issued a certificate of public convenience and necessity conditioned on its charging an initial, "in line" price of 18.5¢ per Mcf, exclusive of taxes, at 15.025 psia, and further conditioned on its maintaining supplemental accounts providing cost data.
 
 
 7
 Exceptions were filed, and in February 1963 the Commission issued Opinion No. 378, wherein it asserted jurisdiction over the lease transaction.[7] Looking to the "essence" of the transaction, the Commission concluded that it was a transfer of natural gas for resale in the interstate market and that such a transfer is subject to the Commission's jurisdiction even when it occurs during the course of production and gathering. The Commission declined to inquire into the cost data and delayed passing on Texas Eastern's certificate; instead, it commanded the assignors to file appropriate rate schedules and applications for certificates for the sale of the gas, to be effective retroactively. The assignors were allowed to file applications for rehearing, but on rehearing the Commission, with one Commissioner dissenting, reaffirmed its previous holding and noted that the failure of the assignors to file for certificates would result in their violating the act. The petitioners are seeking review of these opinions and the orders related thereto.[8] The principal question to be decided is whether the Commission has jurisdiction over these lease transactions.
 
 
 8
 Significant to the disposition of the instant case is the Supreme Court decision in F. P. C. v. Panhandle Eastern Pipe Line Co., 1949, 337 U.S. 498, 69 S.Ct. 1251. Panhandle Eastern, the owner of a pipeline system transporting natural gas in interstate commerce, transferred gas leases to a subsidiary, Hugoton. In return, Panhandle received all the outstanding stock of Hugoton and after a certain period an option to purchase all of the gas produced from the land. At the time of the transfer the land was undeveloped[9] and not connected with any pipeline system. Hugoton thereafter contracted to sell that gas produced prior to the effective date of the option to a non-jurisdictional intrastate seller of natural gas. The gas leases transferred accounted for 12% of the gas reserves relied upon by Panhandle as the supply necessary to perform the services previously authorized by the Commission.
 
 
 9
 The Supreme Court held that the Commission did not have jurisdiction over the transfers of the leases. The Court based its decision on section 1(b) of the Natural Gas Act, which exempts "the production or gathering of natural gas" from Commission jurisdiction.[10] It concluded that this phrase includes "the producing properties and gathering facilities of a natural-gas company"[11] and "incidents connected with the production or gathering of gas."[12] The Court found that "[o]f course leases are an essential part of production."[13] Thus it concluded that since "the transfer of undeveloped gas leases is an activity related to the production and gathering of natural gas and beyond the coverage of the Act, the authority of the Commission cannot reach the sales."[14]
 
 
 10
 The Court was not persuaded by arguments that the gas leases had been dedicated to the discharge of Panhandle's public-utility obligation to render adequate service at reasonable and nondiscriminatory rates:
 
 
 11
 "To accept these arguments springing from power to allow interstate service, fix rates, and control abandonment would establish wide control by the Federal Power Commission over the production and gathering of gas. It would invite expansion of power into other phases of the forbidden area. It would be an assumption of powers specifically denied the Commission by the words of the Act as explained in the report and on the floor of both Houses of Congress. The legislative history of this Act is replete with evidence of the care taken by Congress to keep the power over the production and gathering of gas within the states. This probably occurred because the state legislatures, in the interests of conservation, had delegated broad and elaborate power to their regulatory bodies over all aspects of producing gas. The Natural Gas Act was designed to supplement state power and to produce a harmonious and comprehensive regulation of the industry. Neither state nor federal regulatory body was to encroach upon the jurisdiction of the other. Congress enacted this Act after full consideration of the problems of production and distribution. It considered the state interests as well as the national interest. It had both producers and consumers in mind. Legislative adjustments were made to reconcile the conflicting views."[15]
 
 
 12
 It was noted that for over ten years the Commission had not claimed the right to regulate dealings in gas acreage. The Court concluded, "If the Commission is of the opinion that it should have power to control the disposition of leases by natural-gas companies, it is authorized to call the attention of Congress to that fact."[16] It is significant that annually for the past twelve years the Commission has unsuccessfully asked Congress to grant it jurisdiction over the transfer of leaseholds by natural-gas companies.[17]
 
 
 13
 The Commission first argues that the "Lease Sale" transaction was in essence a sale of gas and thus does not come within the Panhandle decision. The Commission reasons that an ordinary oil and gas lease passes operating rights plus rights to the oil, gas, gas condensates and other minerals. Using a mathematical analogy, it concludes that a "lease" which does not pass operating rights or rights to oil, gas condensates, or other minerals is merely a sale of gas. The Commission relies on five features of these contracts to show that they are in reality sales of gas: (1) the leases assigned gas rights only, and then only above a particular strata; (2) the assignors retained a production payment on natural gas (plant) liquids and separator liquids; (3) the notes for the deferred balance of payments could be accelerated by production in excess of a stated amount over each installment period; (4) Continental (only) operates all of the assigned properties by contract from Texas Eastern on a cost-plus fee basis, with costs recoverable out of the separator liquid proceeds before the production payment is determined; (5) Texas Eastern took the properties from its subsidiary, Louisiana Gas,[18] subject to the debt, but is not personally liable thereon.
 
 
 14
 We disagree with the Commission's interpretation of the transaction. The "Assignment and Conveyance" not only passed rights to the gas, but also passed rights to wells and related production equipment and rights of ingress and egress. The assignors retained no operating rights. Although Texas Eastern entered into a management agreement with Continental, this agreement did not change the essential nature of the transaction. The management agreement stated that the reason for its execution was Continental's experience in operating and managing gas properties in or near Rayne Field, which has an extremely high pressure in its reservoirs. The agreement provided that, "Gathering, handling, separating, treating and storing of the production, the sale thereof and payment therefor shall not be included in this delegation of authority, such operating rights and duties to be performed by Louisiana Gas [Texas Eastern], its successors and assigns." The agreement further retained in Texas Eastern the right to decide whether and where wells would be drilled or deepened, whether secondary recovery or recycling operations would be conducted, and what volume of gas would be nominated for production each month.
 
 
 15
 We are concerned here only with whether these transfers were "leases" as that term was used in Panhandle. Since Panhandle held that "leases" relate to the production or gathering of natural gas and are thus outside Commission jurisdiction, it is clear that any "lease" transfer passing substantial rights which are related to production and gathering, as do the "leases" in the instant case, would likewise be outside Commission jurisdiction. We see no significance in the fact that the leases pertained only to gas and were limited to gas found above a certain depth.[19] Nor do we see anything unusual about the reservation of a production payment out of the proceeds from sales of natural gas liquids.[20] The provision for accelerated payment of the purchase-money notes in case of increased production was merely a method of protecting the assignor's collateral security; there were no provisions for decelerated payments in case of decreased production. As already noted, the Management Agreement retained a number of controls in Texas Eastern. Such agreements are not an uncommon practice.[21]
 
 
 16
 The Commission argues that in light of Phillips Petroleum Co. v. Wisconsin, 1954, 347 U.S. 672, 74 S.Ct. 794, the Panhandle case is not a bar to jurisdiction in the instant case. Phillips held that sales of gas by producers in interstate commerce for resale are within the Commission's jurisdiction. It is contended here that, since Texas Eastern intended at the time of the transfer of the leases to send the gas produced therefrom into interstate commerce for resale, the transfer is a jurisdictional one.
 
 
 17
 The Panhandle case, however, held that transfers of gas leases are exempt as an activity related to production and gathering. The Court in Phillips expressly recognized this holding,[22] but was there able to find jurisdiction because "production and gathering, in the sense that those terms are used in § 1(b), end before the sales by Phillips occur."[23] This Court found jurisdiction for sales at well head in Continental Oil Co. v. F. P. C., 5 Cir. 1959, 266 F.2d 208, cert. denied, 361 U.S. 827, 80 S.Ct. 75, 4 L.Ed.2d 70 (1959), on the basis that such sales involved facilities for the sale of gas rather than facilities of production.[24] We recognized this distinction in Deep South Oil Co. v. F. P. C., 5 Cir. 1957, 247 F.2d 882, 889:
 
 
 18
 "The exemption of production and gathering merely means that the physical activities, facilities and properties used by petitioner in the production and gathering of natural gas are not within the commission's power of regulation. However, there is nothing in the Act which suggests, either expressly or by implication, that by the exemption of production and gathering, Congress intended that the wholesale sales of natural gas in interstate commerce which are consummated before the gas has been gathered or processed should not be regarded as sales in such commerce over which the Commission was granted exclusive jurisdiction to regulate." (Emphasis added.)
 
 
 19
 We are bound by Panhandle's classification of leaseholds as being part of the "physical activities, facilities and properties" used in production and gathering. Sales at or near well head, however, are another matter. As stated in F. P. C. v. J. M. Huber Corp., D.N.J. 1955, 133 F.Supp. 479, 484, aff'd, 236 F.2d 550 (3 Cir. 1956), cert. denied, 352 U.S. 971, 77 S.Ct. 363, 1 L.Ed.2d 324 (1957):
 
 
 20
 "To say that the Commission has no authority over the real property interests a natural gas company acquires or relinquishes has little relevancy to a decision on jurisdiction over a sale at a point where production and gathering have ceased. In this case Huber has not attempted to sell or dispose of its interest in its gas wells, but rather seeks to terminate the flow of the product of the wells — the gas."
 
 
 21
 Thus, we conclude that the lease transactions in the instant cases are outside the Commission's jurisdiction. The Commission complains that this will leave a "gap" in its regulatory powers. Fifteen years ago the Supreme Court in Panhandle authorized the Commission to bring this to the attention of Congress,[25] and the Commission has repeatedly done so. If in its wisdom Congress has declined to act, we have neither the power nor the inclination to act in its stead.
 
 
 22
 Our decision as to jurisdiction makes unnecessary any determination of such questions as whether the D. C. Circuit opinion was binding on the Commission as "the law of the case." As to Texas Eastern's application, we are of the opinion that it should be remanded to the Commission to determine whether the public convenience and necessity require that the certificate be denied, granted, or granted conditionally, in view of the cost of acquisition. We note with regret that this is essentially what the D. C. Circuit told the Commission to do three and one-half years ago.
 
 
 23
 The orders are reversed and remanded for further proceedings not inconsistent with the opinion of this Court.
 
 
 24
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 Although a large, developed gas reserve, the Rayne Field gas as yet was not connected with any pipeline transporting natural gas in interstate commerce nor was it dedicated to any sale in interstate commerce
 
 
 [2]
 The total purchase price was $134,395,700.00. The purchaser was actually Louisiana Gas Corporation, a wholly-owned subsidiary of Texas Eastern, which in turn assigned its interest to Texas Eastern. Unless otherwise noted, Texas Eastern will be treated as the purchaser
 
 
 [3]
 Texas Eastern Transmission Corp., Opinion No. 322, 21 F.P.C. 860 (1959)
 
 
 [4]
 287 F.2d at 145
 
 
 [5]
 Id. 287 F.2d at 146
 
 
 [6]
 The Examiner's report stated:
 "As far back as 1949, the Commission contended it had jurisdiction over the sale by Panhandle of certain leases and leasehold interests covering an estimated 12 per cent of the total gas reserves of Panhandle but the Supreme Court in F.P.C. v. Panhandle Eastern Pipe Line Company, et al., [347] 377 U.S. 498, [69 S.Ct. 1251, 93 L.Ed. 1499] recognized and upheld the traditional industry practice of a natural gas company to buy and/or sell leases and leasehold interests which are `not connected with any pipeline system' (emphasis supplied) without the approval of the Commission. From this, it would appear, one of the prerequisites to Commission jurisdiction is that the natural gas under the leases or leasehold interests must first be connected to a pipeline system transporting natural gas in interstate commerce. The Commission argued before the D.C. Circuit, in the following case, it did not have jurisdiction over Texas Eastern's acquisition of the Rayne Field leases and leasehold interests and, in its opinion, the Court of Appeals, D.C. Circuit, in Public Service Commission of the State of New York v. F.P.C., [109 U.S.App.D.C. 289] 287 F.2d 143, 145 said `* * * the Commission has been held to lack jurisdiction over gas leases' citing F.P.C. v. Panhandle, supra. It is contended in the briefs filed herein the Supreme Court reversed its decision in the Panhandle case, supra, by its decision in Phillips Petroleum Co. v. Wisconsin, et al., 1954, 347 U.S. 672, [74 S.Ct. 794]. Quite to the contrary. In Phillips the Supreme Court recognized and reaffirmed the Panhandle prerequisite of the gas being attached to an interstate system of pipelines before the Commission acquired jurisdiction. * * *
 "* * * [T]he natural gas under consideration by the Supreme Court in its Phillips opinion, supra, had previously been attached to, or connected with, an interstate system of pipelines and, because of this connection, the gas flowed in interstate commerce and thereby became subject to the jurisdiction of the Commission.
 "In applying the principles of the Panhandle and Phillips opinions, supra, to the evidence of record in this hearing, it is concluded the Commission was without jurisdiction over the Rayne Field lease and leasehold acquisition and the natural gas under said leases and leaseholds by Texas Eastern until (1) the gas was connected to an interstate system of pipelines or (2) the gas was dedicated to a sale in interstate commerce."
 
 
 [7]
 Texas Eastern Transmission Corp., Opinion No. 378, 29 F.P.C. 249 (1963)
 
 
 [8]
 The petitions which were filed in this Court for review of Opinion No. 378 (Nos. 20,560; 20,564; 20,582; 20,587 and 20,591) were filed while the applications for rehearing were still pending. After the opinion on rehearing was rendered, Marr, Sun and General Crude filed new petitions (Nos. 20,829; 20,846 and 20,847) seeking review of both opinions, thus avoiding any jurisdictional problems. Continental and Texas Eastern, however, merely filed supplements to their petitions so as to include therein the opinion on rehearing. We conclude that this was sufficient to give this Court jurisdiction under 15 U.S.C. § 717r(b)
 
 
 [9]
 See 337 U.S. at 500, 519, 69 S.Ct. 1251
 
 
 [10]
 The Natural Gas Act § 1(b), 15 U.S.C. § 717(b), states:
 "(b) The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."
 
 
 [11]
 337 U.S. at 505, 69 S.Ct. at 1256
 
 
 [12]
 Id. at 506, 69 S.Ct. at 1257
 
 
 [13]
 Id. at 505, 69 S.Ct. at 1256
 
 
 [14]
 Id. at 515, 69 S.Ct. at 1261
 
 
 [15]
 Id. at 509-513, 69 S.Ct. at 1258-1260 (footnotes omitted)
 
 
 [16]
 Id. at 515-516, 69 S.Ct. at 1261
 
 
 [17]
 See Texas Eastern Transmission Corp., Opinion No. 378-A, 30 F.P.C. * * *, n. 1 (1963) (dissenting opinion)
 
 
 [18]
 See note 2, supra
 
 
 [19]
 Cf. 3 Summers, Oil & Gas 603, 614 (Perm. ed. 1958); 2 Williams & Meyers, Oil & Gas 269; Merrill, The Oil and Gas Lease — Major Problems, 4 Neb.L.Rev. 488, 528, 531 (1962)
 
 
 [20]
 Cf. Bryan, Overriding Royalty Under Oil, Gas and Mineral Leases in Louisiana, 29 Tul.L.Rev. 340 (1954)
 
 
 [21]
 See 3 Summers, Oil & Gas 708 (Perm. ed. 1958)
 
 
 [22]
 347 U.S. at 678, 74 S.Ct. 794, 797
 
 
 [23]
 Ibid
 
 
 [24]
 Accord, J. M. Huber Corp. v. F.P.C., 3 Cir. 1956, 236 F.2d 550, 556, cert. denied, 352 U.S. 971, 77 S.Ct. 363 (1957), which distinguished Panhandle as involving the sale of gas leaseholds. But cf. Saturn Oil & Gas Co. v. F.P.C., 10 Cir. 1957, 250 F.2d 61, 68, cert. denied, 355 U.S. 956, 78 S.Ct. 542, 2 L.Ed.2d 532 (1958)
 
 
 [25]
 337 U.S. at 515-16, 69 S.Ct. 1251